And our last case for argument this morning is Rivas-Jarquin v. Garland. Mr. Buczynski. Good morning, Your Honors. Buczynski for Petitioners. Two issues in this case. The first is whether there's a pattern or practice of persecution in Nicaragua. The second is whether this same evidence supports the more stringent burdens for withholding of removal and protection under the Convention Against Torture. The meaning of the phrase pattern or practice has been developed through case law, and it means a systematic, pervasive, or organized effort to kill, imprison, or severely injure members of the protected group. When this is shown, the asylum applicant does not need to show that he or she would be singled out for persecution. One obvious example mentioned in Banks is the persecution of Jews by Nazi Germany. But the level of persecution does not need to be this extreme, and it cannot obviously be an impossible standard to meet. In Ibrijivan, the Third Circuit took a look at religious persecution in Eritrea. The claim was rejected by the agency because the petitioner had never experienced problems related to his faith and because his brother had remained in Eritrea without his parents. The petitioner, however, documented his claim with a State Department report and other articles, which showed incidents of the government breaking up Pentecostal weddings, arresting Pentecostals, locking children in shipping containers for carrying Bibles, arresting hundreds of adults from disfavored religious groups, and torturing members of disfavored religious groups until they signed statements repudiating their faith. The Third Circuit concluded that these materials could easily demonstrate an objective basis for a well-founded fear of persecution. And this was so despite the fact that the petitioner and his brother had never experienced any harm. In Tegin, the Eighth Circuit reversed the board where the Ethiopian government kept political parties fractured by requiring them to organize along ethnic lines and suppressed opposition by systematically persecuting leaders. In Bromfield, the Ninth Circuit reversed or held that there was a pattern of practice of persecution of gay men in Jamaica due to a statute criminalizing homosexual conduct and widespread targeted violence against homosexuals. Here we have similar facts. The Nicaraguan government was responsible for more than 325 killings in the 2018 pro-democracy uprising. 2,000 were injured, hundreds were illegally detained, tortured, and disappeared. More than 80,000 were exiled in neighboring countries. The government did not take steps to investigate or prosecute those responsible. Instead, it actively strengthened impunity for human rights abusers and carried out a campaign of harassment, intimidation, and violence towards perceived enemies of the regime. By August 2018, the government instituted a policy of exile, jail, or death for anyone perceived as opposition. It amended terrorism laws to include pro-democracy activities and used the justice system to characterize civil society actors as terrorists, assassins, and coup mongers. Articles in the record also indicate that this included doctors and other health care professionals who treated injured protesters. Rivas' family owned and operated a pharmacy in Managua. She provided medical supplies and money to a doctor who was treating injured protesters. She also provided these items to others and to a church. This doctor had to flee and he's now in Costa Rica. Rivas did all of this to support the protesters. She supports an opposition party in Nicaragua, the Constitutionalist Liberal Party. Her brother, Saul, participated in the protests and also fled Nicaragua along with another sibling. This situation is akin to the situation in Cabrillo, Tegan, and Bromfield. Much like Bromfield, the statute targeting homosexual conduct, Nicaragua amended terrorism laws to include pro-democracy activities. Much like Tegan, Nicaragua is suppressing opposition by systematically targeting them. The situation is sufficiently extreme and it's not undermined by the fact that Rivas' mother remained in Nicaragua without harm. Yubrijivat's brother also remained in Eritrea. The Third Circuit still concluded that similar evidence could easily demonstrate a well-founded fear. Well, Mr. Budzinski, obviously the question is not the sufficiency of evidence. Right. And you've told us in your brief, I gather it's outside the record, that Ms. Rivas' mother later left the country, which basically triggered a series of thoughts in my mind about whether even if this denial is affirmed, is there an avenue for changing country circumstances? To take the historical precedent of Nazi Germany, somebody applying for asylum in 1933, whose case was being adjudicated, let's say in 1938, by then the situation had changed drastically. Yes. So with the changed circumstances, the Immigration Court and the Board, they're going to be looking at the circumstances there in Nicaragua currently versus when Ms. Rivas was applying. And I don't think the situation on the ground there has changed sufficiently for them to grant a motion to reopen on that basis. In similar cases, what I've seen, the conclusion by the Board or the Immigration Court being, is that this is more a continuation of the same circumstances and not something sufficiently changed to warrant reopening. So I think it would be a very hard case for them to try to reopen and continue with their case based on changed circumstances at this point. Moreover, Rivas' mother was not safe when she was in Nicaragua. She had to pay for nightly surveillance and she had to watch her steps. The Board dismissed Rivas' contention, contending that there had only been a few isolated incidents of harm to professionals who treated protesters. Beyond this being generally dismissive of the extent of the harm here, it unnecessarily narrows the issue. The broader claim here is that the Nicaraguan government is persecuting anyone perceived as opposition. They've instituted a policy of exile, jail, or death for anyone perceived as opposition. We don't need to narrow it necessarily to medical professionals. The Board also contended that what Nicaragua is doing is merely civil strife and harsh conditions. Obviously, we disagree. We believe that a policy of exile, jail, or death goes far beyond that. That it's certainly systematic, pervasive, and organized. And while this language comes from the case law, I think there's a normative problem here with the language as well. I think you can really throw it at any situation and it's going to stick. I'm not sure what sort of persecution cannot be characterized as civil strife or harsh conditions. The language really doesn't help us define a point at which something tips into a pattern or practice of persecution. The same facts I've just discussed also warrant withholding of removal and protection of the Convention Against Torture. Respondent has argued that the Convention Against Torture claim was waived as insufficiently developed. That's not accurate. Respondent argues that the same facts also warrant and meet the more stringent burden for Convention Against Torture protection. If there are no further questions, I'll reserve the remainder of my time for voting. That's fine. Thank you. May it please the Court. Alana Young for the Attorney General. The only issue before this Court is whether Petitioner has shown that the record compels reversal of the agency's pattern or practice determination. She has not, Your Honor. This is a case of civil strife. This is not a pattern or practice claim. This Court has again and again stated that when the record shows, as this case shows, that there's civil strife, that there's political turmoil, even when there's human rights abuses, Your Honors, that causes substantial harm, substantial hardships to an ethnic minority, a group, some of whose members may have engaged, be engaged in insurgency against the government, that does not render each noncombatant member of the minority or of the group a subject of persecution. That's the case I'll be making. Is there any doubt that this is the President's policy of exile, jail, or death for political opponents? There is no doubt, Your Honor. There is no doubt because we have in the State Department human rights reports indicating that in August 2018, the Ortega administration provided this policy of exile, jail, or death for anyone perceived as opposition. That's true, Your Honor. But if Your Honor looks at Exhibit 3, beginning at AR 291, we have August 2018 is when that administration instituted that policy. And then we look at the subsequent evidence from August, April, August 2019 and 2020, and we see that that policy is not as, in fact, implemented as harshly or as directly or as, in fact, as exile, jail, or death for anyone perceived as opposition. Instead, what we see is the general populace, medical doctors, some medical doctors. We see just people living their everyday life, them suffering from the effects of repressions of the Ortega administration. So the evidence is showing not only—not that it's limited to oppositions or that they're being subject to jail, exile, or death, but it's the entire population that's suffering from this repression. And that's where it's civil strife and political turmoil and not directed persecution at this group or at any of the groups. There are three groups that Petitioner proposes. The evidence does not show a systematic, pervasive, or organized effort to kill in prison or severely detained one of those three groups. And that's the high standard that this court has set. This is the same Ortega and Sandinista government that the United States government sought to undermine through the arms for hostages deals in the 1980s? Yes, Your Honor. It is. It is, Your Honor. However, this court has held that the pattern or practice claim is a very fact-intensive inquiry, and we look at the record in the case. The record in this case does not show—unfortunately, there is human rights abuses that the general populace or a large segment of the populace does experience, but that doesn't show systematic, pervasive, or organized effort against one of the particular groups. Are there any groups from Nicaragua that the U.S. government accepts as sufficiently threatened at this point that their members are entitled to asylum under current U.S. law? We don't have that information in the record, Your Honor. What I can tell you is the U.S. government does have a Temporary Protective Program, TPS, and Nicaraguans, Hondurans, El Salvadorans, Mexicans—not Mexicans—are entitled to TPS, and that's based on different determinations that the Department of Homeland Security and different aspects of U.S. government determined. Did you say— Humanitarian parole. It's not asylum or— Yes, Your Honor. It's humanitarian. Green card. Yes, Your Honor. It's different than asylum withholding of removal and cap protection. TPS. I'm sorry. Temporary protective status, Your Honor. And what are those countries? Nicaragua is concluded in them, Honduran. They believe the most recent ones have been if there's been the earthquakes because of the earthquakes in Hades. If there's a humanitarian situation, the U.S. government will permit individuals from those countries to come over temporarily to the United States, but, in fact, we have extended the temporary status, TPS, for those individuals. That's not in the record here, Your Honor. What you have before you is a very high-standard pattern or practice claim for supporters of protesters, opponents of the SLN, or professionals who aided in the provisions of the care of the protesters. The country condition evidenced here shows civil strife and does not meet this court's high standard. So, I guess, help me out. On the one hand, you seem to be saying the government's announced policy of exile, jail, or death is not actually being implemented as broadly as stated, but, at the same time, you're also saying that there are much wider humanitarian and human rights abuses that affect everybody in Nicaragua. Yes, Your Honor. Let me explain. Both of those things are true. Your Honor, the policy of exile, jail, or death for anyone perceived as opposition, that's what the State Department, that's the language that the State Department has, and that was implemented in August 2018. Take, for example, the other evidence in the record. One of the claims is regarding medical professionals. Medical professionals who are helping protesters or who are acting as oppositions, they're not being, some of them, some of them are being exiled, jailed, or have unfortunately lost their lives, but not all of them. The reports from the country condition actually show that the medical professionals are being fired, unfortunately, from their jobs for treating protesters, or they're suffering other repercussions because of their act of supporting the protesters. It's not blanket exile, jail, or death for anyone perceived as opposition. The country condition evidence, the evidence in this record shows, it applies, shows different levels of harm, threats, intimidation to different parts of the population, and not direct, and not specific to opponents or FLN supporters of protesters or professionals who are helping medical care workers. That's the claim group. Those are the three claim groups that petitioners are proposing, and the evidence shows more than that. It shows civil strife, political turmoil. There are human rights abuses that the general population is experiencing. I direct, Your Honor, I direct you to Krishna Pillai. That is the government's best case. It explains the pattern of practice claim and the standard before this court, the fact-intensive inquiry. It explains what, even though a population is experiencing human rights abuses, even though a substantial part of the population is experiencing hardship, that doesn't mean that they've established that it's systematic, pervasive, or an organized effort to kill, jail, or severely injure that segment of the population. Thank you. Unless the court has any other questions. Thank you. The government rests on its breath. Mr. Brzezinski. Two quick points. First, there's some discussion about this situation affecting the general populace. That's not accurate. The government supporters are not suffering any persecution. It's only opposition to the government. Additionally, unless something changed recently, TPS is not available right now for Nicaraguans. My clients cannot apply for that. I do believe humanitarian parole is available for Nicaraguans. That's not a permanent solution. They can come to the United States, but if they want to stay here, they're going to need to find some other way to do that. So those are two different things? I thought they were just different ways of referring to the same program.  TPS is temporary protected status. Parole is an alternative to a lawful admission to the United States for someone who doesn't have a visa, for example. Right. And you have to apply from outside the country? Yes. Well, you could do both.  Usually. Oh, okay. Yeah. If there are no further questions. Thank you. Thank you. Our thanks to both counsel. We'll take the case under advisement, and that concludes.